**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ALEX G. MCCUNE, d/b/a Shenandoah
Business Systems,
<u>Plaintiff-Appellee,</u>

No. 99-1765

v.

XEROX CORPORATION,
<u>Defendant-Appellant.</u>

ALEX G. MCCUNE, d/b/a Shenandoah
Business Systems,
<u>Plaintiff-Appellant,</u>

No. 99-1829

v.

XEROX CORPORATION,
<u>Defendant-Appellee.</u>

Appeals from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
W. Craig Broadwater, District Judge.
(CA-97-23-3)

Argued: May 1, 2000

Decided: July 24, 2000

Before MOTZ and TRAXLER, Circuit Judges, and
Frank W. BULLOCK, Jr., United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed in part and vacated in part by unpublished per curiam opin-
ion.

**COUNSEL**

**ARGUED:** Charles McKinley Surber, Jr., JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Appellant. Henry Malcolm Lloyd, BOYKIN & CASANO, P.C., Washington, D.C., for Appellee. **ON BRIEF:** Stephen M. LaCagnin, Julia M. Chico, JACKSON & KELLY, P.L.L.C., Morgantown, West Virginia, for Appellant. William Richard McCune, Jr., WM. RICHARD MCCUNE, JR., P.L.L.C., Martinsburg, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Xerox Corporation ("Xerox") appeals the district court's denial of its post-trial motion for judgment as a matter of law, or in the alternative for a new trial. By way of cross-appeal, Alex G. McCune ("McCune") challenges the district court's reduction of his damages award. We affirm in part and vacate in part.

I.

McCune, doing business as Shenandoah Business Systems, was an authorized sales agent/owner for Xerox from 1983 until January 1997. McCune's assigned territory was the panhandle area of West Virginia. McCune performed at a high level until 1995-96 when he failed to meet his sales quotas for eight consecutive quarters. Xerox attributed this downturn to McCune's developing other aspects of his business, such as cellular phones, and an inexperienced sales agent employed by McCune. McCune, on the other hand, attributed the lion's share of his performance deficiencies to lack of support from Xerox. Specifically, McCune complained about the Agent Channel Managers (ACMs) assigned to his territory. ACMs provide a number of support

2

functions including assisting with sales, filling orders, and introducing new products. McCune believed his ACMs, one of whom had no prior management experience, were inattentive to his needs and put forth little effort.

In September 1996, Xerox informed McCune and other agents/owners that it would not be extending their contracts and that the agents/owners would learn in the fourth quarter whether they would be offered a new contract. In late December 1996, McCune received a new contract in the mail for his "review and signature." J.A. 1058. The contract indicated that it would be effective as of the earlier of the date of execution or January 1, 1997. McCune signed the contract on December 29 and continued to sell Xerox products in January 1997.

Towards the end of January, Xerox informed McCune that it would not be offering him a new contract. Xerox terminated McCune, but compensated him for sales made in January. McCune brought suit alleging breach of contract, tortious interference, and fraud. The case was tried before a jury, which returned a verdict for McCune. The jury awarded McCune $66,268.40 for breach of contract and $331,283 for fraud ($226,283 compensatory damages and $105,000 emotional distress damages). Xerox renewed its motion for judgment as a matter of law and moved in the alternative for a new trial. The district judge, finding there was a double recovery, reduced the verdict by $66,268.40, but affirmed the remainder of the award. Xerox appeals, and McCune cross-appeals the reduction of his award.

II.

We review the district court's denial of Xerox's Rule 50(b) motion for judgment as a matter of law de novo, viewing the evidence in the light most favorable to McCune and drawing all reasonable inferences in his favor. See Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir.), cert. denied, 120 S. Ct. 184 (1999). If there is evidence upon which a reasonable jury could have found in favor of McCune, this court must affirm the final verdict. Id. The district court's denial of Xerox's motion for a new trial is reviewed for abuse of discretion. See id.

A.

Xerox argues that it was entitled to judgment as a matter of law because McCune did not provide clear and convincing evidence of fraud under Virginia law.[1] See Winn v. Aleda Constr. Co., 315 S.E.2d 193, 195 (Va. 1984) ("The burden is upon the party charging fraud to prove it by clear and convincing evidence."). In Virginia, the requisite elements of a fraud claim are:

> (1) a false representation

> (2) of a material fact

> (3) made intentionally and knowingly

> (4) with intent to mislead

> (5) reliance by the party misled, and

> (6) resulting damage to the party misled.

See Prospect Dev. Co. v. Bershader, 515 S.E.2d 291, 297 (Va. 1999). We will consider each element in turn.

1. False representation

As for the first element, McCune alleged at trial that Xerox misrepresented its intent to continue McCune's agency for 1997. McCune offered evidence indicating that Xerox informed McCune and other agents/owners in September 1996 that it would not be extending their contracts and that the agents/owners would learn in the fourth quarter whether they would be offered a new contract. In late December, McCune received a new contract which provided that for agents covering substantially the same territory as under the old contract, the agreement would be "effective as of the earlier of the date of execution or January 1, 1997." J.A. 65. McCune's territory was unchanged and he signed the contract on December 29, 1996. Franklin L.

_____

[1] The parties agree that Virginia law applies to the fraud claim.

4

Edmonds, a Xerox vice president, agreed at trial that Xerox was under no obligation to send McCune the new contract.

McCune's sales representative, Anthony Triggs, testified that he attended a Xerox fall sales conference during which Jeannette Ill, a Xerox district sales manager, said that all agents/owners were "going to be offered a contract." J.A. 474. Triggs also testified that he and McCune attended a January 1997 kickoff meeting where Edmonds welcomed them back for another year. Shortly after this meeting, and after McCune made a number of sales in January 1997, McCune received a letter from Xerox informing him "that Xerox has decided not to offer Shenandoah Business Systems a 1997 Xerox Authorized Sales Agent Agreement." J.A. 79. Xerox claimed this decision was not made until after review of McCune's 1997 business plan, but Jeannette Ill's deposition testimony read to the jury indicated that in October 1996 Xerox had decided to "[t]erminate [McCune's] contract." J.A. 302.

In disputing the sufficiency of the evidence for this first element, Xerox observes that under Virginia case law "fraud must relate to a present or a preexisting fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." Blair Constr., Inc. v. Weatherford, 485 S.E.2d 137, 139 (Va. 1997) (internal quotation marks omitted). While Xerox accurately states the general rule, it ignores one important exception. If a party "makes the promise, intending not to perform, his promise is a misrepresentation of present fact, and if made to induce the promisee to act to his detriment, is actionable as actual fraud." Id. at 139 (quoting Colonial Ford Truck Sales, Inc. v. Schneider, 325 S.E.2d 91, 94 (Va. 1985)). The facts of this case, unlike those in Words v. Xerox Corp., 205 F.3d 1336, 2000 WL 234502 (4th Cir. 2000) (unpublished), fall squarely within the exception. McCune provided evidence not only that Xerox promised to renew his contract, but also that when Xerox made this promise it never intended to keep it. McCune offered evidence, e.g., the testimony of a government procurement officer, that Xerox fraudulently promised to renew his contract so that he would continue working for Xerox assisting it in obtaining a major contract with a U.S. Fish & Wildlife facility; after Xerox had virtually captured the government business, it refused to renew its contract with McCune. Given this

5

evidence, a reasonable jury could find that Xerox's promise to renew McCune's contract was a misrepresentation of <u>present</u> fact.

Based on the foregoing, a reasonable jury could have found by clear and convincing evidence that Xerox misrepresented its intention to continue McCune's agency.

2. <u>Of a material fact</u>

A representation that a party's contract will be renewed is clearly material. The evidence produced at trial indicated that McCune earned approximately $46,000 in profit from the sale of Xerox equipment in 1996 and spent fifty percent of his time on Xerox matters. In addition, Anthony Triggs, McCune's employee, spent 100 percent of his time on Xerox matters. The continuance of McCune's status as an authorized sales agent/owner for Xerox was material, and sufficient evidence was presented to establish this element.

3. <u>Made intentionally and knowingly</u>

McCune offered clear and convincing evidence that Xerox intentionally and knowingly misrepresented its intent to retain McCune as an agent/owner. As previously mentioned, Jeannette Ill's deposition testimony read to the jury indicated that Xerox made its decision to terminate McCune in October 1996. Nevertheless, Xerox offered assurances that the contract would be renewed, sent McCune a new contract for his signature, and compensated McCune pursuant to the 1997 schedule for sales made in January 1997. Hence, a reasonable jury could have concluded that Xerox intentionally and knowingly misrepresented its intent to continue McCune's agency.

4. <u>With the intent to mislead</u>

As for intent to mislead, McCune offered extensive testimony from William Nebel who oversaw purchases of copying equipment for the United States Fish and Wildlife Service. In 1996, the government was completing construction of a conservation training center ("the center") in Shepherdstown, West Virginia. Nebel served as the team leader for graphics and publishing for the center until his retirement

6

in August 1997. Nebel testified that he had experienced problems with the Xerox bureaucracy and its high pressure sales techniques, and that Xerox had misled him about the capabilities of equipment. Aware of Nebel's complaints, Xerox assured him that the new center would deal with McCune rather than with corporate Xerox. With McCune's office just eight miles from the center, Xerox emphasized that supplies and service could be obtained quickly. Nebel soon "developed a relationship of trust and respect" with McCune and Triggs which was far different from his previous dealings with corporate Xerox. J.A. 104.

Nebel decided to purchase for the center a used Xerox DocuTech, which cost $157,600, and signed a non-binding letter of intent on November 12, 1996. News of McCune's termination in January 1997 "bothered" Nebel because Xerox had earlier assured him that he "had a company right down the street for [the center's] needs and concerns." J.A. 111. Though upset with Xerox's actions, Nebel testified that he did not cancel the purchase of the DocuTech because it "was too far along." J.A. 126. From this evidence, a reasonable jury could have concluded that Xerox misled McCune regarding his contract so that McCune would continue to use his best efforts to cultivate the relationship with Nebel. Further, the jury could have reasoned that once the purchase of the DocuTech was too far along to be canceled, Xerox terminated McCune after securing a large sale.

McCune also offered testimony that Xerox, though it had already decided to terminate him, sought his 1997 business plan and Triggs' compensation rate. McCune testified that in January 1997 his ACM telephoned him and "specifically wanted to know how I was compensating [Triggs]." J.A. 654. McCune further testified that Xerox had never before requested this information. Shortly after McCune was terminated, another agent/owner, whom Xerox was considering for McCune's territory, called Triggs and offered him employment. Triggs testified that this agent/owner "knew of the arrangements that [McCune] and I had as far as what I was being compensated." J.A. 490. Based on the evidence, a jury could have concluded that Xerox intentionally misled McCune in order to obtain information about the operation of his business.

7

5. <u>Reliance by the party misled</u>

McCune offered evidence of his reliance on the representation that his relationship with Xerox would continue. He continued to work on Xerox's behalf by making sales and maintaining goodwill for Xerox among his customers. He closed approximately six sales in January 1997 and was compensated pursuant to Xerox's 1997 schedule. McCune could have closed down the Xerox portion of his business and searched for other business opportunities; but instead he continued to concentrate his and Triggs' efforts on Xerox matters. Thus, clear and convincing evidence of reliance was presented to the jury.

6. <u>Resulting damages</u>

McCune also offered clear and convincing evidence of damages. Though McCune admitted that 1995-96 were poor sales years, he testified that the needs of the new center, which continued to buy Xerox products after McCune's termination, "would naturally get us off to a good start." J.A. 655. And, if McCune did get off to a good start and was designated a high performing agent under the contract, then the term of the agreement could have been extended from one to three years.

McCune called as an expert witness Dr. William Johnson, a professor of economics at Shepherd College. Dr. Johnson offered extensive testimony, to a reasonable degree of economic certainty, concerning the loss to McCune. Based on the 1997 quota, Dr. Johnson projected the revenues and expenses associated with the sale of Xerox equipment from 1997 to 2003. The calculations were based on the assumption that McCune would have met his sales quota and that his revenue growth would have increased at three percent per year. Dr. Johnson calculated McCune's total loss to be $517,135, though the jury chose to award only $226,283 in compensatory damages for fraud. Hence, McCune offered clear and convincing evidence of resulting damages.

In sum, the district court did not err in denying Xerox's motion for judgment as a matter of law on the fraud claim. The evidence viewed in the light most favorable to McCune reveals that the jury, by clear

8

and convincing evidence, could have reasonably found in favor of McCune and awarded compensatory damages.**2**

B.

As part of McCune's fraud recovery, the jury also awarded $105,000 in emotional distress damages. Under Virginia law, a plaintiff may recover damages for emotional distress, absent proof of physical injury or willful and wanton conduct, if the defendant has committed an intentional tort against the plaintiff. See Sea-Land Serv., Inc. v. O'Neal, 297 S.E.2d 647, 653 (Va. 1982). Fraud, of course, is a quintessential intentional tort. See Fox v. Deese, 362 S.E.2d 699, 706 (Va. 1987) (describing actual fraud as an intentional tort).

In the present case, McCune testified that his termination "embedded a very big void in my mind" and that it "wreaked havoc on my mental stability within myself over the last 18 months." J.A. 736. The district court determined that these conclusory allegations of distress were sufficient to present the claim to the jury. We disagree. In this circuit, a district court should grant a Rule 50(b) motion "if the plaintiff has failed to adduce substantial evidence in support of his claim." DeMaine v. Bank One, Akron, N.A., 904 F.2d 219, 220 (4th Cir. 1990) (per curiam). McCune's evidence of emotional distress, which consisted of two sentences in a 1455-page joint appendix, cannot be described as substantial. There is no evidence, for example, that McCune sought medical treatment for the distress, that he was unable to function as usual, that he withdrew from activities, or that he suffered physical manifestations caused by the distress. Without question, the evidence presented by McCune falls far short of the degree of proof required to enable a reasonable juror to award emotional distress damages. See id.; see also Bailey v. County of Georgetown, 94 F.3d 152, 157 (4th Cir. 1996) (holding that a court should submit an issue to the jury "only when that issue is supported by substantial evi-

_____

**2** The jury also awarded McCune $66,268.40 for breach of contract. Because the compensatory damages for fraud must necessarily encompass the contract damages and we affirm the reduction of the entire award by the amount of the contract damages, see infra Part II.C, we need not linger over the contract claim which we nevertheless find to be supported by substantial evidence.

dence which shows a probability and not a mere possibility of proof.") (internal quotation marks omitted); Gairola v. Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985) (holding that "a mere scintilla of evidence is not enough to defeat a motion for a directed verdict"). Thus, the district court erred in denying Xerox's Rule 50(b) motion regarding McCune's emotional distress damages, and we therefore vacate this portion of the damages award.

C.

Concluding that McCune received an impermissible double recovery from the jury, the district court on Xerox's motion reduced the total award by $66,268.40, the amount of the contract damages. Xerox contends that the district court erred and should have instead reduced the award by $226,283, the amount of the compensatory damages for fraud. By way of cross-appeal, McCune argues that there was no duplicative recovery and that the district court erred in reducing the award.**3**

"Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed." Conway v. Icahn & Co., 16 F.3d 504, 511 (2d Cir. 1994); see also Singleton Management, Inc. v. Compere, 673 N.Y.S.2d 381, 385 (N.Y. App. Div. 1998) (explaining that in order to avoid a double recovery damages recovered in tortious interference suit must be reduced by amount of the settlement of the breach of contract claim); Carter v. New York, 546 N.Y.S.2d 648, 650 (N.Y. App. Div. 1989) (holding that a claimant who had recovered under § 1983 for wrongful conviction and imprisonment could not also recover under the state's Unjust Conviction and Imprisonment Act). In the present case, the district court found that the fraud and breach of contract were related, based on a single set of facts, and "constitute[d] a single course of conduct which caused [McCune] a single form of damages." J.A. 1444-45. We agree. The fraud and contract damages represented lost profits from the agency agreement. The contract, however, limited damages for breach to one year, whereas no such limitation applied to fraud damages. Hence, the fraud damages must necessarily include the contract

_____

**3** The parties agree that New York law applies to the contract claim.

10

damages, and the district court properly reduced the award of damages by $66,268.40.**4**

III.

For the foregoing reasons we affirm the district court's denial of Xerox's post-trial motions as to the fraud and contract claims. We also affirm the district court's reduction of McCune's total damages award by the amount of the contract damages. However, we vacate the emotional distress damages because of insufficient evidence.

AFFIRMED IN PART, VACATED IN PART

_____

**4** We also conclude that the district court did not abuse its discretion in denying Xerox's motion for a new trial.

11